UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 22-cv-20332-BLOOM

MANUEL BALBIN,

    Plaintiff,

v.

J. LATIN, et. al.,,

    Defendants.
_____/

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

**THIS CAUSE** is before the Court upon Defendants Janice Latin, Jule Wooden III, Craig McGahee, and Devin Williams (collectively "Defendants") Motion for Summary Judgment, ECF No. [69], ("Motion"). Plaintiff, Manuel Balbin ("Plaintiff" or "Balbin"), has not filed a response and the time to do so has passed. The Court has carefully reviewed the Motion, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is granted.

**I.      BACKGROUND**

Plaintiff filed his *pro se* Complaint for Violation of Civil Rights Under 42 U.S.C. § 1983, ECF No. [1] ("Complaint"), on February 1, 2022, asserting claims against Lieutenant Wooden, Sergeant Latin, Corporal McGahee, and Officer Williams, as well as two unnamed corrections officers, an unnamed doctor, Corporal D. Larbi, MDCR Director Daniel Junior, Miami-Dade County Mayor Danielle Levine Cava, and the Board of County Commissioners. The Court granted Plaintiff's request to proceed *in forma pauperis*, ECF No. [4], but under the screening provisions of 18 U.S.C. § 1915(e)(2), dismissed claims against certain Defendants except the claim against Lieutenant Wooden, Sergeant Latin, Corporal McGahee, and Officer Williams for failure to protect in violation of the Eighth Amendment. *See* ECF No. [9].

Plaintiff alleges he was attacked by other inmates in his unit on August 20, 2021, and the Defendants failed to take adequate measures to prevent the attack. *See generally* ECF No. [1]. Specifically, he alleges that Lieutenant Jule Wooden III and Corporal Craig McGahee violated his constitutional rights because they failed to relocate him after he complained about threats from other inmates on August 16, 2021. *See id.* at 18–19. Sergeant Janice Latin violated his rights because she failed to relocate him after he submitted a grievance complaining about threats from other inmates on August 18, 2021. *See id.* at 19. On August 20, 2021, the day of the incident, Officer Devin Williams violated his rights because he failed to take Plaintiff out of the visitation booth where the attack occurred and put him back in his cell when he demanded it. *See id.* at 21. Plaintiff claims he has suffered physical and emotional injuries resulting from the Defendants' conduct. *See id.* at 5, 25–26.

On February 1, 2023, Defendants filed the instant Motion in which they contend that summary judgment must be granted. Defendants assert they are entitled to qualified immunity and the undisputed material facts establish that (1) Plaintiff "cannot demonstrate that he faced a substantial risk of serious harm," (2) Plaintiff "cannot demonstrate that any defendant acted with deliberate indifference," and (3) Plaintiff "cannot demonstrate causation" because "[n]one of the four defendants were the cause-in-fact of his injury because none of them were the officers who took him out of his cell and put him in the visitation booth." ECF No. [69] at 2.

## II.   MATERIAL FACTS

Based on Defendants' uncontested[1] Statement of Undisputed Material Facts, ECF No. [68], along with the evidence in the record, the following facts are not in dispute.

---

[1] Plaintiff did not respond to Defendants' Statement of Undisputed Material Facts and did not submit his own Statement of Undisputed Material Facts. The Court has reviewed Defendants' Statement of Undisputed Material Facts and finds that it is supported by properly cited record evidence. Accordingly, Defendants' Statement of Undisputed Material Facts is deemed undisputed and otherwise admitted. *See* Local Rule 56.1(c).

On August 3, 2021, Plaintiff was transferred from the Metro West Detention Center to Unit 6A4 at the Pretrial Detention Center, and then he was transferred to Unit 8C1. ECF No. [68] at ¶ 7. On August 7, 2021, Plaintiff filed a Prison Rape Elimination Act ("PREA") complaint, claiming that another inmate made sexual advances towards him. *Id.* ¶ 8. Plaintiff needed to be moved out of Unit 8C1 while the PREA incident was investigated. *Id.* ¶ 9. However, because Plaintiff had exhausted all general population locations due to multiple "keep separates" with other inmates, he was relocated to administrative housing in the special management unit, Unit 8A1. *Id.* ¶¶ 10–11. The special management unit houses inmates who need to be separated from the general population, including those who are in fear for their life. *Id.* ¶ 12. Once Plaintiff was placed in administrative housing, Corporal McGahee deemed him a "House Alone" inmate due to the PREA allegations and to protect him from further victimization. *Id.* ¶ 13. A House Alone inmates wear red, rather than the orange jumpsuit of a general population inmate, and they are not to have any physical contact whatsoever with any other inmate. *Id.* ¶¶ 24–26.

Within a few days of Plaintiff moving into Unit 8A1, an inmate nicknamed "Twin" told his roommate nicknamed "Meechy" and other inmates in the unit about why Balbin was being housed there. *Id.* ¶ 28. Those inmates and others began threatening Plaintiff with violence, which continued the following days. *Id.* ¶ 29.

On August 9, 2021, Plaintiff was cleared to return to general population by the Facility Safety Cell Review Committee. However, due to Plaintiff's custody level and charges, there were no available locations to move him to, so he remained in Unit 8A1 as a House Alone inmate. *Id.* ¶¶ 30–31. The search for a new location was also put on hold because, on August 8, 2021, another inmate in Unit 8A1 became ill and was transported to the hospital where he tested positive for COVID-19. *Id.* ¶ 32. As such, on August 17, 2021, a Corrections Health Services Infections Control Specialist determined that Unit 8A1 should be placed under quarantine as a COVID-19

3

precaution. *Id.* ¶ 34. Plaintiff claims that on August 16, 2021, he told Lieutenant Wooden and Corporal McGahee that other inmates in the unit had threatened him. *Id.* ¶ 35.[2] The Defendants claim that threats in jails are common and inmates in MDCR custody are not moved to other units simply because they complain that another inmate is threatening them. *Id.* ¶¶ 36–37. Plaintiff admits he has been threatened upwards of fifteen or twenty times while incarcerated and has claimed to be in fear for his life "multiple times." *Id.* ¶ 38. Given the number of threats inmates make to each other, staff must consider each alleged threat on a case-by-case basis—and here Plaintiff was continued as a House Alone inmate. *Id.* ¶ 41–42. Plaintiff was locked in a cell by himself, and the inmates he complained about were locked in their own cells. *Id.* ¶ 43. Under normal circumstances, they would never have been in the same place at the same time unsupervised. *Id.*

On August 18, 2021, Plaintiff filed a grievance complaining about threats by Twin and Meechy, as well as two other inmates nicknamed "Jackboy" and "Roll." *Id.* ¶ 48. MDCR's Reentry Program Services Bureau ("RPSB") is responsible for ensuring "the collection, analysis, coordination, and management of the inmate grievance process." *Id.* ¶ 49. The RPSB supervisor's initial response, also dated August 18, states: "Based on this complaint, this grievance will be sent to facility operations." *Id.* ¶ 50. The Facility Operations Bureau oversees security. *Id.* ¶ 51. A copy of the grievance was delivered to Sergeant Latin, the shift commander on duty at the time. *Id.* ¶ 52. As far as Sergeant Latin could tell from the initial written response, the grievance was being handled by the proper bureau. *Id.* ¶ 53. On August 19, 2021, Grievance Clerk Sheria Darling assigned the grievance to Administrative Security Sergeant Tory Thompkins for review. *Id.* ¶ 54. The review was not completed before the incident took place the next morning. *Id.* ¶ 55.

---

[2] The Court accepts as true that this conversation took place.

On August 20, 2021, Plaintiff woke up hearing threats from the other inmates in his unit. *Id.* ¶ 58. Over the previous days, the inmates had been threatening to jump or stab or kill him if he went to the recreation yard. *Id.* ¶ 59. At 7:00 a.m., Officer Williams and fellow recreation officer, Jean Dorvilier, came to Unit 8A1 to take inmates to recreation. *Id.* ¶ 61. Officer Williams asked Balbin if he wanted to go to recreation. *Id.* ¶ 67. Plaintiff declined and said, "They're trying to kill me." *Id.* ¶ 68. One of the officers responded, "[W]e'll take you by yourself," but Balbin replied "No, I'm not going. I'm not going anywhere. I'm staying in my cell." *Id.* ¶ 69.

Officer Williams and Officer Dorvilier secured the six inmates who were going to recreation to a "six-pack" restraint—a chain with three single handcuffs coming out of each side. *Id.* ¶ 70. At 7:11 a.m., the officers escorted those inmates from the eighth floor to the recreation yard on the first floor. *Id.* ¶ 71.

Given the recent imposition of the quarantine on Unit 8A1—and given that COVID-19 was "a very serious thing" in August 2021—all cells in the unit needed to be cleaned and sanitized. *Id.* ¶ 72. At approximately 7:20 a.m., two unidentified corrections officers came to take Plaintiff out of his cell so that staff could come clean the unit all at once. *Id.* ¶ 73. Plaintiff assumed the officers were trying to take him to the recreation yard, so he said, "I can't go to yard. People are trying to kill me." *Id.* ¶ 74. One of the officers responded, "You're not gonna go to yard. You're gonna go in a holding cell so you'll be safe. … I'm just gonna fumigate really quick, and when that's done, that's it, put you right back in the cell." *Id.* ¶ 75. When Plaintiff refused, the other officer replied, "You don't have a choice. You have to come out. We have to fumigate your cell." *Id.* ¶ 76. The officers escorted Balbin from his cell to the eighth floor A-wing visitation booth area and placed him in a booth. *Id*. ¶ 77. The outer door to the visitation booth area was propped open. *Id*. ¶ 78. Although a latching mechanism on the booth doors prevented Balbin from getting out, there was no lock on the door to prevent anyone outside from getting in. *Id*. ¶ 79.

5

Once Unit 8A1 was emptied, sanitation workers used abrasive chemicals to disinfect and then air out the cell. *Id.* ¶ 80. None of the Defendants had any authority over the cleaning or the staff assigned to clean. *Id.* ¶ 82.

After some time passed, Plaintiff, from inside the booth, saw the staff who had been "fumigating" the cells. *Id.* ¶ 84. Plaintiff started banging on the glass and called out to an officer and asked to be taken back to his cell, but no officer obliged. *Id.* ¶ 85. If any of those officers "simply took [Plaintiff] back to his cell, nothing would have happened." *Id.* ¶ 86.

At 8:31 a.m., Officer Dorvilier and Officer Williams arrived back to the eighth floor with the inmates from recreation. *Id.* ¶ 87. Officer Dorvilier walked in front of the inmates and Officer Williams was assigned as "back officer" to make sure all inmates got off the elevator. *Id.* ¶¶ 88–89. Officer Dorvilier looked down the A-wing hallway and saw a labor supervisor, a non-sworn staff member, cleaning. *Id.* ¶ 91. Non-sworn staff members are not allowed to be near inmates who are being escorted. *Id.* ¶ 92. Officer Dorvilier began walking down the hallway to tell the labor supervisor to move. *Id.* ¶ 93. The inmates walked through the lobby and into the hallway. *Id.* ¶ 94.

Inmates Demetrius Saunders, Jervar Jackson, and Lazaro Borcela, who were in the front of the six-pack, saw Balbin in the visitation booth. Instead of continuing to walk, they veered off to the right into the visitation booth area, opened the latch to the booth where Balbin was placed, and began attacking him. *Id.* ¶ 95. Officer Williams did not know what the inmates were doing in there, as he had not seen or spoken to Balbin since earlier that morning. *Id.* ¶ 96. Within six seconds of the inmates entering the visitation booth area, Officer Neville began pulling on the chain of the six-pack restraint to try to separate Saunders, Jackson, and Borcela from Balbin. *Id.* ¶ 97. Officer Williams went around Officer Neville to assist him in trying to separate the inmates and gave the inmates loud orders to stop fighting, to no avail. *Id.* ¶ 98. Two other officers joined in to assist. *Id.* ¶ 99.

Twenty-three seconds from when Saunders, Jackson, and Borcela entered the visitation booth area, officers had succeeded in pulling all three inmates and Balbin out into the hallway. *Id.* ¶ 100. The fight continued, and ten seconds later, Officer Williams was trying to pull the last inmate off Balbin. Another officer held onto Balbin, trying to separate him from that inmate. *Id.* ¶¶ 101–103. At 8:33 a.m., an officer called for backup (inmate-on-inmate) via radio. *Id.* ¶ 104. Over the course of twenty-nine seconds, thirty-two backup officers entered the eighth floor lobby to assist. *Id.* ¶ 105. Four more officers later entered the lobby from the elevator. *Id.* ¶ 106. Within the next minute, Balbin was successfully separated and pulled out into the lobby. *Id.* ¶ 107.

## III. LEGAL STANDARD

**Summary Judgment**

A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Further, the Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is satisfied, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

**Qualified Immunity**

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)); *see also Storck v. City of Coral Springs*, 354 F.3d 1307, 1313 (11th Cir. 2003). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law," *Wood v. Kesler*, 323 F.3d 872, 877 (11th Cir. 2003) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)), and the doctrine accordingly

8

represents "a balance between the need for a remedy to protect citizens' rights and the need for government officials to perform their duties without the fear of constant, baseless litigation." *Kingsland*, 382 F.3d at 1231 (citation omitted). Accordingly, "[q]ualified immunity is, as the term implies, qualified. It is not absolute." *Id.* at 1233.

"A government official acts within his discretionary authority if his actions were (1) undertaken pursuant to the performance of his duties and (2) within the scope of his authority." *Mikko v. City of Atlanta, Ga.*, 857 F.3d 1136, 1144 (11th Cir. 2017) (citing *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995)). "In applying each prong of this test, [courts] look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). "In other words, 'a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.'" *Mikko*, 857 F.3d at 1144 (quoting *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998)). "Once the public official has established that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity does not apply." *Storck*, 354 F.3d at 1314 (citing *Lee*, 284 F.3d at 1194).

IV.   **DISCUSSION**

**A. Defendant Williams**

Plaintiff alleges that on August 20, 2021, the date of the incident, Officer Devin Williams violated his rights because he failed to take Plaintiff out of the visitation booth where the attack occurred and put him back in his cell when he demanded it. *See* ECF No. [1] at 21. Defendants argue that although:

9

> Balbin claims that the officer he spoke to regularly worked on the eighth floor and was wearing the green MDCR uniform. Pl.'s Dep. 123:20–124:15. That officer is not Officer Williams. First, Officer Williams was a recreation officer; he was not assigned to a particular floor, but rather spent each shift going to units, taking inmates to and bringing them back from recreation. Second, Officer Williams was not wearing a green corrections jacket; he was wearing a white polo shirt and shorts—the uniform of a recreation officer who spent his shifts outside in the August heat. Third, Officer Williams left the eighth floor with the other inmates at 7:11 a.m. and returned with them at 8:30; it is impossible for Balbin to have spoken to him from the visitation booth before the other inmates returned from the yard. *See* Declaration of Devin Williams ¶¶ 5, 14–16, 22–23 [ECF No. 67-8].

ECF No. [69] at 7 n. 1. As noted, because Plaintiff did not respond to Defendants' Statement of Undisputed Material Facts and did not submit his own Statement of Undisputed Material Facts, the Defendants' Statement of Undisputed Material Facts is deemed undisputed and otherwise admitted. *See* Local Rule 56.1(c). Accordingly, the undisputed facts establish that Defendant Williams is not the officer to which Plaintiff spoke. Defendant Williams's Motion is therefore due be granted.

**B. Defendants Latin, McGahee, and Wooden**

The remaining Defendants argue they are entitled to summary judgment because they are protected by qualified immunity. *See generally* ECF No. [69]. Plaintiff does not dispute that Defendants were acting within the scope of their employment. *See* ECF No. [1] at 4 ("Each Defendant is an employee of Miami-Dade County, they are all government officials for Florida, and they were all on duty during the incident."). Because Defendants have satisfied the discretionary authority requirement, the burden shifts to Plaintiff to establish that qualified immunity is not applicable.[3]

The United States Supreme Court has outlined a two-part test to determine whether a plaintiff meets its burden on rebutting a qualified immunity defense: (1) "[t]aken in the light most

---

[3] As discussed, Plaintiff failed to file a Response to Defendant's Motion. Nevertheless, the Court considers whether any record evidence supports the position that qualified immunity is not applicable.

favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"; and (2) if a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Moreover, courts "may consider these two prongs in either order; an official is entitled to qualified immunity if the plaintiff fails to establish either." *Piazza v. Jefferson Cty., Ala.*, 923 F.3d 947, 951 (11th Cir. 2019) (citing *Jacoby v. Baldwin Cty.*, 835 F.3d 1338, 1344 (11th Cir. 2016)).

Here, while the Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners," not every instance of prisoner-on-prisoner violence "translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A prisoner hoping to prevail on a claim that a prison official failed to protect him from an attack by another prisoner must satisfy three elements. "First, the plaintiff must show that she was incarcerated under conditions posing a substantial risk of serious harm." *Cox v. Nobles*, 15 F.4th 1350, 1358 (11th Cir. 2021) (cleaned up) (quoting *Farmer*, 511 U.S. at 834). "Second, the plaintiff must show that the 'prison official had a sufficiently culpable state of mind, amounting to deliberate indifference.'" *Id.* (cleaned up) (quoting *Farmer*, 511 U.S. at 834). "Third, and finally, the plaintiff must demonstrate causation—that the constitutional violation caused [his] injuries." *Id.* (citing *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014)). Plaintiff "must establish all three elements to prevail on [his] failure-to-protect claims." *Id.* Conversely, the failure to establish one of the three elements is fatal to Plaintiff's claims. *See id.*

**1. Plaintiff did not face a substantial risk of serious harm**

"In the jail setting, a risk of harm to some degree always exists by the nature of its being a jail." *Purcell ex rel. Estate of Morgan v. Toombs County*, 400 F.3d 1313, 1323 (11th Cir. 2005).

11

The element "is evaluated using an objective standard." *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015). The plaintiff must show an "unreasonable risk of serious damage to his future health or safety." *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020) (cleaned up). He must also show that he faced "a 'strong likelihood' of injury, 'rather than a mere possibility." *Brooks*, 800 F.3d at 1301 (quoting *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990)).

Plaintiff contends that the risk he faced was the inmates in his unit who threatened to attack him. "The unfortunate reality is that threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Marbury v. Warden*, 936 F.3d 1227, 1236 (11th Cir. 2019) (cleaned up). In light of that reality, the Eleventh Circuit has "upheld dismissal of or summary judgment against deliberate indifference claims where, although a plaintiff told prison officials of a threat by another inmate or inmates, the prison officials were not deliberately indifferent to a substantial risk of harm." *Id*.

One of those cases is *Brooks v. Warden*. Fred Brooks was placed in the special management unit of a Georgia prison. Within days, the inmate in the adjacent cell, Tremayne Watson, threatened to physically attack and sexually assault him. *Brooks*, 800 F.3d at 1298. Brooks feared for his safety, despite being housed in a separate cell. *Id*. He gave detailed notes of the threats to the defendant officers but was not moved. *Id*. A few weeks later, all thirty-two doors in the dormitory opened simultaneously, leading to a riot during which Watson carried out his threat, attacking and sexually assaulting Brooks. *Id*. at 1299.

The Eleventh Circuit held that Brooks failed to plausibly allege that a substantial risk of serious harm existed prior to the riot. *Id.* at 1301. To face serious harm, Brooks and Watson "both needed to be released from their cells simultaneously in an unsupervised situation." *Id.* The most that could be taken from Brooks's complaint was that "it was *possible* for the events that transpired to occur: that his and Watson's cell doors would open simultaneously during a situation that

prevented immediate intervention by the guards, leading to serious injury." *Id.* (emphasis in original). But "mere possibility is not enough," the court explained. *Id.* While the risk of harm was not nonexistent, the court found it so attenuated that it "required a 'perfect storm of events' in which all 32 doors in a maximum security wing opened at once." *Id.* at 1303. Even though Brooks had alleged that the dormitory doors opened before, he had not alleged that either he or Watson had ever become free of their cells when the doors had opened, let alone at the same time. *Id.* at 1302–03. Until the doors opened, Brooks was not in imminent or foreseeable danger. *Id.* at 1303.

The facts in Brooks are remarkably similar to the instant case, and the Eleventh Circuit's opinion is controlling. *See Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003) ("[O]nly Supreme Court cases, Eleventh Circuit caselaw, and [Florida] Supreme Court caselaw can 'clearly establish' law in this circuit."). As in *Brooks*, record evidence establishes that shortly after Plaintiff was placed in the special management unit, the other inmates started threatening him. Plaintiff feared for his safety, despite being housed—alone—in a separate cell. Plaintiff told Lieutenant Wooden and Corporal McGahee about the threats. He informed Sergeant Latin via the grievance he submitted but he was not moved from his cell. A few weeks later, he was attacked by the other inmates.

Plaintiff, like Brooks, cannot establish that he faced a substantial risk of serious harm prior to the attack. He was a House Alone inmate prohibited from having any physical contact with any other inmate. He lived alone in a locked cell—and the other inmates in the unit also lived in locked cells. When Plaintiff was taken out of his cell, he was taken by himself and escorted by an officer. For Plaintiff to face a strong likelihood of serious harm, he and the other inmates had to be outside their cells in an unsupervised situation. But nothing in the record supports that Balbin and the other inmates were ever outside of their cells at the same time, let alone unsupervised where an attack

could occur. Rather, what happened is akin to the "perfect storm" in *Brooks*. As Defendants explain:

> In *Brooks*, the Eleventh Circuit called all thirty-two dormitory doors opening a "perfect storm." 800 F.3d at 1301, 1303. If anything, the "storm" that led to Balbin being attacked was even more "perfect":
>
> (1) On August 8, Deshawn Jackson, who was housed in Unit 8A1, became ill and went to the hospital, where he tested positive for COVID-19. He was later placed in medical quarantine and then medical isolation. *Statement* ¶ 32.
>
> (2) Balbin was cleared to return to general population on August 9, but because there were no available locations—given his custody level and charges—he remained in Unit 8A1 as a House Alone inmate. *Id.* ¶ 31.
>
> (3) On August 17, Corrections Health Services placed Unit 8A1 under quarantine as a COVID-19 precaution. *Id.* ¶ 34.
>
> (4) At 7:11 a.m. on August 20, the other inmates in Unit 8A1 were taken to recreation. *Id.* ¶ 71.
>
> (5) Because Unit 8A1 had been placed under quarantine, the cells needed to be sanitized. *Id.* ¶ 72.
>
> (6) At 7:20 a.m., two unidentified correctional officers took Balbin out of his cell and placed him in the eighth floor A-wing visitation booth so that all cells in the unit could be sanitized at once. *Id.* ¶¶ 73–77.
>
> (7) The outer door to the visitation booth area was propped open. *Id.* ¶ 78.
>
> (8) The door to the booth where the unidentified officers placed Balbin was not locked. *Id.* ¶ 89.
>
> (9) When Officer Williams and Officer Dorvilier returned from the recreation yard with the other inmates, a non-sworn staff member was cleaning the hallway near the entrance to Unit 8A1. *Id.* ¶¶ 87, 90–92.
>
> (10) Officer Dorvilier walked ahead of the other inmates down the hall to tell the staff member to move away. *Id.* ¶ 93.
>
> (11) The other inmates saw Balbin in the visitation booth. *Id.* ¶ 95.
>
> (12) The inmates who wanted to attack Balbin were in the front of the six-pack restraint and were able to steer it. *Ibid.*

14

> (13) Those inmates veered into the visitation booth area, opened the door to Balbin's booth, and attacked him. *Ibid.*
>
> It is only this "utterly unplanned" series of events that put Balbin in harm's way. *Brooks*, 800 F.3d at 1302–03. To the *Brooks* court, the singular event of all the doors opening was "utterly unplanned," *even though* Brooks had alleged that the doors had involuntarily opened previously. Balbin, on the other hand, does not allege that any of the events that led up to this incident had transpired before.

ECF No. [69] at 13–14. The Court agrees with Defendants' analysis. Plaintiff's complaint to Lieutenant Wooden and Corporal McGahee that the other inmates threatened him, and his grievance to the same effect that was delivered to Sergeant Latin, contained no information about how the threats might possibly be carried out. Rather, his complaints alluded to a possible attack in the recreation yard—and Plaintiff was thus permitted to refuse recreation and his status as a House Alone inmate was continued. Considering his House Alone status, Plaintiff cannot offer any further reason to support the conclusion that the threats he reported evidenced a substantial risk of serious harm. Instead, his general statements regarding threats were "precisely th[e] type of vague statement[s] that convey[] nothing about the nature of the anticipated risk" and, as a result, do "not rise to the level of deliberate indifference to a substantial risk." *Marbury*, 936 F.3d at 1237. Plaintiff's failure to establish the first element necessarily results in Defendants Latin, McGahee, and Wooden being entitled to qualified immunity.

## V.   CONCLUSION

While the Court is sympathetic to Plaintiff's hardships and the circumstances surrounding his attack, it is constrained by the undisputed facts and the application of controlling law.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment, **ECF No. [69]**, is **GRANTED**.

2. A final judgment will be entered by separate order.

**DONE AND ORDERED** in Chambers at Miami, Florida, on June 12, 2023.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

Manuel Balbin
#B05748
Cross City Correctional Institution
Inmate Mail/Parcels
568 NE 255th Street
Cross City, FL 32628
PRO SE